## HERBECK *v.* GERMAIN.

1. EVIDENCE—EXPERTS—HYPOTHETICAL QUESTIONS—ASSUMPTION OF FACTS.

> Where, in a personal injury case, there is testimony tending to show that plaintiff, though she had been ill before the accident, had fully recovered, a hypothetical question, put to a physician, which assumes that she was in good health, is not objectionable as not based on the evidence, though that fact is disputed.

2. WITNESSES — CROSS-EXAMINATION — IMPUTATION OF UNTRUTHFULNESS.

> Questions asked of a defendant on cross-examination are not prejudicial because imputing untruthfulness to him, where his testimony and that of plaintiff are so opposed that both cannot be true.

3. SAME—DISCRETION OF COURT.

> A large discretion is given the trial judge in controlling the cross-examination of witnesses, and unless his rulings amount to an abuse of discretion, they will not be cause for reversal.

4. TRIAL—INSTRUCTIONS—ASSUMPTION OF DISPUTED FACTS.

> Where there is testimony from which the jury might find that plaintiff had fully recovered her health at the time of the accident, an instruction that she was suffering from neurasthenia at the time is properly refused.

5. SAME—EVIDENCE.

> Where defendant's wife has testified to the circumstances of a collision between her husband's team and plaintiff's, remarks made by her directly inconsistent with her version of the accident are admissible, though made in her husband's absence, and an instruction that the jury should disregard her remarks, because she could not thus bind her husband, is properly refused because too broad.

Error to Saginaw; Snow, J. Submitted January 4, 1906. (Docket No. 4.) Decided May 24, 1906.

Case by Margaret Herbeck against Edward Germain for personal injuries. There was judgment for plaintiff, and defendant brings error. Affirmed.

*Weadock, Purcell & Weadock,* for appellant.

*F. E. Emerick,* for appellee.

MOORE, J.   The plaintiff, a married woman, brought suit against the defendant to recover damages which she claims to have sustained through the negligence of defendant, while seated with her husband and mother in a Concord buggy, drawn by one horse and going in a southerly direction on Washington avenue in the city of Saginaw, and for medical attendance for which she claims to have paid from her own money.   She contends the defendant negligently drove his team into the buggy in which she was riding, frightening her husband's horse, breaking down the wheels of the buggy, and that she received personal injuries and suffered from fright and shock, so she became affected with neurasthenia.   The declaration contained two counts, one charging the defendant's negligence was gross, wanton, and willful, and brought on neurasthenia, and the other alleged the same injury, but charged plaintiff was suffering with a slight affection of the nerves at the time of the accident, which was aggravated by the injury.   The defendant pleaded the general issue, and claimed he was not in fault for the injury; but, if any was received, it was the result of the carelessness of plaintiff's husband, who suddenly turned his horse in front of the team of defendant, thus causing the accident.   The plaintiff recovered a judgment for $1,000.   The case is brought here by writ of error.

It is said the court erred in permitting an answer to the following question:

"*Q.* I want to ask you one more question based upon Mr. Herbeck's testimony and her own, Mrs. Herbeck's testimony, in this case.   I want to ask you now, assuming that the woman was in a state of normal good health, good, fair, normal health, when this fright and shock occurred; will you state whether the condition in which you found her would naturally and pathologically follow from the fright and shock she received ? "

The objection was that it was a hypothetical question,

based on the claim that the plaintiff was a well woman at the time of the injury, when in fact she was a sick woman. The above question came after the following colloquy:

"Q. Now, doctor, assuming the fact to be that on the very day that she received this shock and injury, on that Sunday afternoon, and keeping in mind the explanation of shock and fright that I have given you and also counsel here, that you understand the whole situation and that at that time she was in a condition where all the symptoms of neurasthenia had disappeared. There was no insomnia, no pain of any kind, no bladder or liver or stomach trouble, that she improved, ate well, and was in that physical, mental and nervous condition, that her color had improved, and appetite, and strength. Assuming that now to be the condition, doctor, then I ask you whether the condition in which you found her at your examination could be accounted for or ascribed to the effect of the fright and shock which she received that day, the 12th of June?

"Mr. Weadock: I object to that, because it does not state the fact and assumes a condition that does not exist. (Reads from Dr. Cowles' testimony.) Dr. Cowles' testimony shows the woman was not a well woman, and they cannot escape it, and no expert questioning based upon the fact she was a well woman can stand under the facts of this case.

"Mr. Emerick: I have not said she was a perfectly well woman. I am willing to incorporate what counsel read in the question, and then ask what fright or shock was necessary at that time to produce the condition at the end of seven months. (Question read. Further objection, and reading from Dr. Cowles' testimony.)

"The Court: I think the question assumes it was not entirely removed.

"Mr. Emerick: Put that in.

"Q. Assuming, doctor, that the symptoms had all disappeared, but that there was some disease yet, or some effect yet of neurasthenia, that the woman was in a slightly nervous condition, but that the stomach—she could eat and sleep—and then take her condition when you examined her at the end of seven months; I ask you if the fright and shock she received would cause and account for the condition in which you found her when you examined her last week?

"A. I would say it might."

Then came the question upon which error is assigned.

It was the claim of plaintiff that, though she had been ill before the accident, she had fully recovered and had been housecleaning all the week before the injury, and she so testified. Her mother testified she was perfectly well before the accident. Her sister, Mrs. Leyman, where she took dinner shortly before she was hurt, so testified. Her physician testified she was apparently well. In 2 Jones on Evidence, § 373, it is said:

"If there is no testimony in the case tending to prove the facts assumed in the hypothetical question, such question is improper. The facts must be proved or offered to be proved; and if there is no evidence to prove such facts, or if the facts assumed in the interrogatory are wholly irrelevant to the issue, the question should be excluded. The question is not necessarily to be rejected by the court although the facts assumed by counsel to be true are not proved, or although the question does not state the facts as they actually exist. The facts are generally in dispute; and it is sufficient if the question fairly states such facts as the proof of the examiner tends to establish, and fairly presents his claim or theory. It cannot be expected that the interrogatory will include the proofs or theory of the adversary, since this would require a party to assume the truth of that which he generally denies. A question should not be rejected because it does not include all the facts, unless it thereby fails to present the case fairly."

We think there was testimony upon which to base the question. What we have said of this assignment applies to the second assignment of error.

The fourth assignment of error relates to the putting of a question, on cross-examination, to Dr. Sample, a witness for defendant. This question was framed by incorporating in it the reading of three or four pages of testimony. It is now said the question is incoherent, that it does not assume a state of facts on any theory supported by any evidence, that it should have been reduced to writing, citing *Jones* v. *Village of Portland*, 88 Mich. 613 (16 L. R. A. 437), *Mayo* v. *Wright*, 63 Mich. 32, and was of too great length to be retained by human

memory.    It may be said of the last two suggestions that
they were not made in the court below.    The length of
the question can be accounted for in part by the fact
that while counsel was framing it, the counsel for defend-
ant continued to object to it, because it was omitting
something.    We think there was testimony upon which
to base the question.

A group of assignments relate to questions which, coun-
sel say, resulted in an attempt to get before the jury the
contents of medical works or illustrations from them.
Whatever may have been the purpose of counsel, it did
not result in getting before the jury the contents of any
medical work, and while the cross-examination was very
long it was invited by the attitude and the answers of the
witnesses.

Error is assigned to the following questions on cross-
examination of defendant:

"*Q.* And didn't you discover early in the case that if
they didn't turn to one side or to the other, but they drove
straight along, and you drove into them, you were guilty,
as a matter of law?"

It is said this question was unjust, unfair, and un-
warranted, and an imputation on the witness, and if for
no other reason the case should be reversed.    The other
question reads:

"*Q.* What would you call a washwoman that came to
your house?"

Counsel say:

"This is another question of the same nature as the one
last complained of, only more vicious, if anything, in the
prejudice it had a tendency to arouse.    *    *    *    There
was no washwoman in the case, none heard of or con-
nected with the transaction at all.    Mr. Germain had
spoken of no washwoman."

Counsel is quite right in saying the first question was
an imputation on the witness.    It is difficult to see how
the case could be tried without imputing a want of truth-
144 MICH.—11.

fulness to either the defendant or the plaintiff and her witnesses. They saw the accident, but their accounts of it are as wide apart as could well be. If the occurrence was as stated by plaintiff it was not as stated by defendant. He, too, had, prior to this question, changed his testimony in relation to how far he was behind the plaintiff when her husband turned his horse, so as to make the collision inevitable according to the version of defendant.

As to the other question counsel is in error in saying Mr. Germain had spoken of no washwoman. On the direct examination defendant testified, among other things, as follows:

" And when I got there, where the old buggy stood, Mr. and Mrs. Herbeck and the old lady were standing and looking at the buggy. We looked it over to see to what extent the buggy was broken. Mr. Herbeck asked me if I would buy him a new buggy, and I said, ' No, I will not buy you a new buggy.' I says, ' You are a farmer, ain't you ? ' and he said, ' Yes, I own 20 acres of land and there is a mortgage on it.' * * * I made the remark that the buggy was a very old buggy, and not suitable for one to ride in; it was criminal to permit— that's the remark I made, and I think I have a right to answer—that it was criminal to endanger the life of any-one, especially an old person, in a buggy of that class. * * * On the way home Mr. Herbeck led his horse, followed us all the way home, and when I got to our driveway, which is north of the house, on the north side of the house, addressing Mr. Herbeck as ' John,' which is a name I have for any one I don't know—I call any one ' John ' whom I don't know—I says, ' John, turn in here,' and he did. * * * Then I came back, and sat on the porch until Mr. Herbeck drove up with the horse. When he drove up with the buggy to our porch, the ladies were still—we were still—sitting on the porch, and then the ladies got up, and I helped the ladies in the carriage, which I do with any one that comes to our place, regardless of who they are, sick or well, the washwoman, or any one else."

While the manner of the cross-examination is not to be commended, there was testimony on the direct examination well calculated to invite it. A large discretion is

given the trial judge, who not only hears what the witness says, but observes the manner of saying it. We cannot say this discretion was so abused in permitting this cross-examination as to call for a reversal of the case.

Error is assigned upon the court's refusal to give defendant's seventeenth request. In that request the court was asked to charge the jury that the plaintiff, at the time of the injury, was suffering from neurasthenia. What we have already said will cover this objection.

It is said the court erred in refusing to give the following:

"I charge you as a matter of law that Mrs. Germain, the wife of the defendant, could not bind him by any statement she made as to the cause of the injury, and I instruct you to disregard all evidence in the case tending to show what Mrs. Germain said about the collision in the absence of Mr. Germain."

Mrs. Germain was a witness in the case. There was testimony tending to show that very soon after the accident, before the parties separated, Mrs. Germain said in substance she was thankful they were not all killed, and did not see what defendant was thinking of to drive that way. This statement, if made, was inconsistent with Mrs. Germain's version given when she was a witness, and was competent to show that inconsistency if for no other reason. The request asked too much, and was properly refused.

Complaint is made of the charge of the court as given. If two or three sentences are separated from the connection in which they were used, they would be subject to criticism; but, when read in connection with the rest of the charge, the criticism is disarmed. The jury were charged, among other things:

"The burden of proof is upon the plaintiff, not only to show negligence and misconduct on the part of the defendant, but also ordinary care and diligence upon the part of her husband and herself at the time of receiving the injury. The plaintiff's husband was not bound, under

the law, in driving his horse ahead of the defendant, to turn either to the right or left, to permit the defendant to pass, and the defendant had a right to rely upon the plaintiff's husband continuing straight ahead as he was driving, without turning to the right or left.

"I charge you, as a matter of law, further, that the defendant had a right to pass the carriage in which the plaintiff was riding, either to the right or left of him as he saw fit, so long as he used ordinary care and prudence in doing so; and the defendant had a legal right to travel upon any part of the highway he saw fit, unless he was to meet and pass another vehicle going in the opposite direction, in which case he must seasonably turn to the right of the middle of the traveled part of the road.

"The statute requiring teams meeting and passing each other, when going in opposite directions, to turn out and give half the traveled roadbed to the passing team, does not apply in this case, and must not be considered by you in connection with this case at all.

"If, from the evidence in the case, you find the plaintiff's husband, upon hearing the approach of defendant's horses, suddenly turned to the left and brought the carriage in which plaintiff was riding immediately in front of the defendant's horses, as they were turned to the left in attempting to pass the carriage in which she was riding, and the collision followed, resulting in injury to the plaintiff, then plaintiff cannot recover, because, if there was injury resulting from the collision under such circumstances, the result of the negligence of the plaintiff's husband in such a case would be imputed to her, and would bar her recovery for any injury which she may have sustained, for the reason that the plaintiff in riding with her husband assumed the risk from lack of skill and want of care in driving; and if the plaintiff's husband, from lack of skill or want of care in any degree, however slight, contributed to the receiving of the injury for which plaintiff claims, she cannot recover."

The record is a very long one. There are other assignments of error than those discussed. We have considered them, but do not deem it necessary to refer to them further.

Judgment is affirmed.

BLAIR, MONTGOMERY, OSTRANDER, and HOOKER, JJ., concurred.